IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO.: 2:25-cr-361 |
| | ) | |
| vs. | ) | 18 U.S.C. § 4 |
| | ) | |
| SANDINO SAVALAS MOSES | ) | INFORMATION (UNDER SEAL) |

## BACKGROUND

1. The Defendant, **SANDINO SAVALAS MOSES**, is a resident of North Charleston, South Carolina.

2. North Charleston is a municipality in South Carolina. From 2019 to 2024, North Charleston received over $10,000 in federal funds each fiscal year.

3. The North Charleston City Council is the elected body clothed with the power and authority to make rules and pass ordinances in North Charleston. The North Charleston City Council is comprised of an at-large mayor and ten council members elected from single-member districts every four years. North Charleston City Council has the power and duty to:

   a. exercise the corporate powers of the City of North Charleston;
   b. consider and enact legislation;
   c. set official city policy;
   d. hold public hearings on matters concerning zoning and grant funds;
   e. approve franchises, enact business license fees, and levy taxes;
   f. adopt an annual budget; and
   g. approve or disapprove requests for zoning.

The North Charleston City Council meets the first and third Thursday of every month.

4. The Public Safety Committee is a committee of the North Charleston City Council comprised of all members of City Council. The Public Safety Committee meets the third Thursday

1

of every month during regularly scheduled City Council meetings. In November 2023, **SANDINO SAVALAS MOSES** was elected to the North Charleston City Council, representing District 3.

5. Jerome Sydney Heyward ("Heyward"), charged elsewhere, is a resident of North Charleston, South Carolina, and from November 2020 to the present, Heyward has served as a member of North Charleston City Council, representing District 5.

6. Hason Tatorian Fields ("Fields"), charged elsewhere, is a resident of Goose Creek, South Carolina. Fields owns and operates HTF Consulting, LLC, an entity that provides consulting and lobbying services to businesses and individuals in South Carolina.

7. Aaron Charles-Lee Hicks ("Hicks"), charged elsewhere, is a resident of North Charleston, South Carolina.

8. Company A, known to the United States Attorney, is a boat manufacturing company located in Berkeley County, South Carolina. Company A is owned by Businessman A, known to the United States Attorney.

9. In 2023, the Charleston County Parks & Recreation Commission ("CCPRC") accepted a proposal from Company A to grant a ninety-year lease on a tract of land in North Charleston, hereinafter the "Property." The lease would allow Company A to build a manufacturing facility, clean up and remediate the property, and pay for a 46-acre public park. In April 2023, the North Charleston City Council, which has jurisdiction over the Property, rezoned the site from general business and light industrial to single-family residential, putting Company A's plans on hold.

10. In February 2024, on behalf of Company A, the CCPRC, as the technical owner of the Property, requested that the City of North Charleston re-zone the property to enable Company A to build the boat manufacturing plant.

11. Anticipating strong community opposition to the proposed rezoning, Company A hired "lobbyists" and "consultants" to promote the project and assist their efforts in rezoning the Property. Company A engaged Hicks and Fields in February 2024. Hicks and Fields were both paid by Company A. Company A agreed to pay Fields $30,000 upfront and $5,000 per month. Company A agreed to pay Hicks $10,000 for March 2024 and $10,000 for April 2024, and later agreed to pay Hicks $5,000 per month for May and June 2024.

12. The rezoning application was scheduled to come before North Charleston City Council's Public Safety Committee for a first reading on April 18, 2024 during the regularly scheduled City Council Meeting.

13. On April 16, 2024, FBI received court-authorization to intercept wire and electronic communications occurring over Heyward's cellular telephone. On April 17, FBI began intercepting Heyward's communications. FBI conducted two, 30-day periods of interceptions: from April 17 to May 16, 2024, and from June 6 to July 5, 2024.

14. During the April 18th, 2024 Public Safety Meeting, amidst strong community opposition, **SANDINO SAVALAS MOSES** moved to table a vote related to the first reading of the rezoning application, resulting in a 30-day delay.

15. Following the vote to table the first reading at the April 18th Public Safety Committee meeting, the first reading was rescheduled for the City Council meeting on May 16, 2024.

16. On April 26, 2024, Businessman A convened a meeting with Fields, Hicks, and several employees of Company A who are known to the United States Attorney at Company A's corporate headquarters in downtown Charleston, South Carolina. The purpose of the meeting was

to coalesce around a plan to win support for the project, both on North Charleston City Council and in the community, before the May 16 City Council meeting.

17. Unbeknownst to most of the attendees, the April 26th meeting at Company A's corporate headquarters was recorded. The recording was later provided to the Federal Bureau of Investigation ("FBI").

18. At the beginning of the meeting, Hicks and Fields expressed that gaining the support of **SANDINO SAVALAS MOSES** and another City councilmember, who is known to the United States Attorney, were the keys to prevailing at the May 16th City Council meeting. Fields told the group that he believed **SANDINO SAVALAS MOSES** was experiencing personal financial difficulties at that time, and that "I know I can get him . . . ."

19. Businessman A expressed skepticism that the approach before April 26, 2024—which involved mustering support in the community and ensuring that community members who were in favor of the project would speak in support of it at City Council meetings—would be successful.

20. As the meeting continued, the group focused their discussion on how to persuade **SANDINO SAVALAS MOSES** and the other councilmember to vote in favor of the rezoning proposal. Fields expressed his ability to successfully appeal to **SANDINO SAVALAS MOSES** and the other City councilmember and agreed to schedule meetings with them.

21. While Fields agreed to meet with **SANDINO SAVALAS MOSES** and the other City councilmember, Hicks agreed to meet with community members and neighborhood groups to garner their support of the boat manufacturing project. Hicks expressed that community support was necessary to give City councilmembers cover to vote in favor of the rezoning application.

22. After the April 26th meeting, Fields contacted **SANDINO SAVALAS MOSES** to schedule a meeting. Prior to his election to North Charleston City Council, **SANDINO SAVALAS MOSES** did not know Fields. On May 4, 2024, Fields drove to **SANDINO SAVALAS MOSES'** residence where the two discussed Company A's proposal in general terms. **SANDINO SAVALAS MOSES** told Fields that he wanted to begin a career as a consultant.

23. Fields told **SANDINO SAVALAS MOSES** about a purported consulting project he was working on that involved an effort to help local churches that were facing a property dispute. Fields asked **SANDINO SAVALAS MOSES** if he would be interested in helping Fields with the project. After **SANDINO SAVALAS MOSES** answered in the affirmative, Fields gave him $200 in cash and stated that he would provide details at a later date.

24. On May 7, 2024, **SANDINO SAVALAS MOSES** and Fields agreed to meet at a local restaurant to discuss issues, including Company A's proposal. On this date, Fields paid **SANDINO SAVALAS MOSES** an additional $250 in cash. **SANDINO SAVALAS MOSES** asked for more details about the purported consulting project, but Fields did not offer additional information.

25. **SANDINO SAVALAS MOSES** left concerned that the cash was not an offer to assist with a consulting project but was instead a bribe in exchange for his support for Company A's proposal and for his vote in favor of the rezoning application.

26. In and around the time that **SANDINO SAVALAS MOSES** and Fields were meeting to discuss Company A's proposal, the FBI was conducting its court-authorized interception of Heyward's cellular telephone. On May 15, 2024, the FBI intercepted a call between Hicks and Heyward that involved a discussion about Fields and **SANDINO SAVALAS MOSES**.

After telling Heyward that **SANDINO SAVALAS MOSES** supported the project, Hicks stated, "Yeah, cause I think they had slide him something."

27. Later on May 15, 2024, the FBI intercepted a telephone call between Heyward and **SANDINO SAVALAS MOSES**. Hicks was surreptitiously listening to the telephone conversation. **SANDINO SAVALAS MOSES** stated that he told Fields that in exchange for his support for the project, **SANDINO SAVALAS MOSES** wanted Fields to "make something happen" and to "give me some money for my district."

28. Heyward counseled **SANDINO SAVALAS MOSES** that directly asking for something in exchange for his vote amounted to a "quid pro quo" and was illegal. Heyward counseled that the preferred approach was to vote in favor of Company A's proposal, and then "tell [Businessman A] what you want after the vote is passed." Heyward further counseled that although **SANDINO SAVALAS MOSES** could communicate with Businessman A, that any such requests should be routed through intermediaries like Hicks, Fields, or Company A employees.

29. Specifically, Heyward told **SANDINO SAVALAS MOSES**, "You can talk to [Businessman A] but don't, I wouldn't talk to him about no deals. No, no, no I can't-I don't want to talk about no deals. You can talk to Fields about a deal. You can talk to his right-hand man [Company A employee] about a deal. You can talk to anyone in there. I wouldn't talk to [Businessman A] because it's his money. I wouldn't talk to him about it. You can talk to Hicks, say, look man I need, I need this done in my district. I'm going to support it [Businessman A] but after this, after the vote clears on this project, I want this done in my district."

30. **SANDINO SAVALAS MOSES** thanked Heyward and stated, "Let's say I didn't talk to you tonight, right? I was lead in the wrong direction here. But what you're telling me now? I should have heard this last week from the person I was talking to. They told me something like

6

you telling me now? It makes sense and sounds right. I just, he talked to me last week? About my love for the district and trying to do anything I can do for them. That's the only thing setting me in that way. But it's a green light if I can get that. But no one explain it to me like that. So, if I hadn't talk to you tonight, I wouldn't have known nothing about this. I would have known nothing. You hadn't call me tonight, person I talked to would have led me astray. Like full blown astray. You know what I'm saying? That's, that you know, that ain't cool." **SANDINO SAVALAS MOSES** was referring to his conversations and dealings with Fields in the days prior to the May 15, 2024 conversation with Heyward.

31. On May 15, 2024, about an hour after the conversation with Heyward about a "quid pro quo", **SANDINO SAVALAS MOSES** and Fields met at the same restaurant where the two met on May 7, 2024. **SANDINO SAVALAS MOSES** recognized Fields' payments as bribe payments in exchange for his support of the rezoning application in favor of Company A. **SANDINO SAVALAS MOSES** returned the $450 in cash to Fields.

32. After receiving the second payment on May 7, 2024, but before returning the payment to Fields on May 15, 2024, **SANDINO SAVALAS MOSES** knew that the purpose of Fields' payments was a bribe in exchange for **SANDINO SAVALAS MOSES'** support of Company A's proposal and official action with respect to the rezoning application, not an agreement to consult on a project to benefit local churches.

33. Further, **SANDINO SAVALAS MOSES** knowingly attempted to conceal the commission of a felony by Fields, to wit, bribery of a public official in violation of Title 18, United States Code, Section 666(a)(2), by returning the money.

34. **SANDINO SAVALAS MOSES** failed to notify an authority as soon as possible.

35. On May 16, 2024, CCPRC withdrew its rezoning application, on behalf of Company A, prior to the Public Safety Committee meeting because they learned that they did not have the necessary support on City Council.

36. On June 17, 2024, an FBI Special Agent approached Fields and asked if he had any knowledge of payments made on behalf of Company A for its rezoning application. Fields denied having any knowledge of payments made to North Charleston City Councilmembers on behalf of Company A.

37. On June 18, 2024, after being approached by an FBI Special Agent, Fields texted **SANDINO SAVALAS MOSES** a photograph of a document that appeared to be an agenda. On June 27, 2024, Fields texted **SANDINO SAVALAS MOSES** about working on behalf of the churches. Fields' communications with **SANDINO SAVALAS MOSES** after being approached by the FBI were an attempt to coverup the bribe payments.

# COUNT 1
## Misprision of a Felony
## 18 U.S.C. § 4

38. The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 37 of this Information as if fully set forth herein.

39. Beginning in or around April 2024 and continuing until on or around June 27, 2024, in the District of South Carolina and elsewhere, the Defendant **SANDINO SAVALAS MOSES**, having actual knowledge of the commission of a felony cognizable by a court of the United States, to wit, bribery and attempted bribery of a public official in violation of Title 18, United States Code, § 666(a)(2), did fail to disclose such knowledge and took affirmative steps to conceal the same by returning the money that was offered and given to him as a bribe to influence his vote in favor of a matter pending before North Charleston City Council, of which **SANDINO SAVALAS MOSES** was an elected member since January 2024, and did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States;

In violation of Title 18, United States Code, Section 4.

BROOK B. ANDREWS
ACTING UNITED STATES ATTORNEY

By: *[signature]*

Whit Sowards (Fed. ID #11844)
Emily Evans Limehouse (Fed. ID #12300)
Assistant United States Attorneys
151 Meeting Street, Suite 200
Charleston, SC 29401